EXHIBITS "G"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RICHARD COLLINS,                :  CIVIL ACTION
                                :
            Plaintiff,          :
                                :  **ORIGINAL**
      vs.                       :
                                :
CITY OF PHILADELPHIA,           :
et al.,                         :
                                :
            Defendants.         :  NO. 16-5671

- - -

              Oral deposition of DETECTIVE KEITH SCOTT,

taken at the City of Philadelphia Law Department, One

Parkway Building, 1515 Arch Street, 14th Floor,

Philadelphia, Pennsylvania, on Thursday, April 13,

2017, commencing at 1:17 p.m., before Andrea M.

Brinton, Certified Court Reporter and Notary Public.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 477-8648
www.summitreporting.com

**DETECTIVE KEITH SCOTT**

```
 1   APPEARANCES:

 2   LAW OFFICES OF MICHAEL I. McDERMOTT
     BY:   MICHAEL I. McDERMOTT, ESQUIRE
 3   1026 Winter Street
     Suite 200
 4   Philadelphia, Pennsylvania 19107
     (215) 925-9732
 5   Counsel for Plaintiff

 6   CITY OF PHILADELPHIA LAW DEPARTMENT
     BY:   AARON SHOTLAND, ESQUIRE
 7   One Parkway
     1515 Arch Street
 8   14th Floor
     Philadelphia, Pennsylvania 19102
 9   (215) 683-5000
     Counsel for Defendants
10
     ALSO PRESENT:
11   Richard Collins
     Sergeant Edward Pisarek
12

13

14

15

16

17

18

19

20

21

22

23

24
```

**DETECTIVE KEITH SCOTT**

```
 1                    I N D E X

 2   WITNESS                                      PAGE

 3   DETECTIVE KEITH SCOTT

 4   EXAMINATION

 5        By Mr. McDermott                          4
          By Mr. Shotland                          48
 6

 7                    -  -  -

 8
                    E X H I B I T S
 9
                                      PAGE FIRST
10   EXHIBIT NO.    DESCRIPTION        REFERENCED

11   Scott-1        Philadelphia Police            11
                    Department Investigation
12                  Report

13   Scott-2        Property Receipt               13

14   Scott-3        Photocopy of Photograph        17

15   Scott-4        Investigation Interview        28
                    Record
16
     Scott-5        Philadelphia Police            38
17                  Department Vehicle or
                    Pedestrian Investigation
18                  Report

19   Scott-6        Investigation Interview        45
                    Record
20
     Collins-1      Photocopy of Photograph        15
21                       -  -  -

22

23

24
```

**DETECTIVE KEITH SCOTT**

1          (By agreement of counsel, the reading,

2    signing, sealing, certification and filing are

3    waived; and all objections, except as to the form of

4    the question, are reserved until the time of trial.)

5                    - - -

6          DETECTIVE KEITH SCOTT, after having been

7    first duly sworn, was examined and testified as

8    follows:

9                    - - -

10          SERGEANT EDWARD PISAREK, after having

11    been first duly sworn, was examined and testified as

12    follows:

13                    - - -

14                EXAMINATION

15                    - - -

16    BY MR. McDERMOTT:

17        Q.    Good afternoon.  My name is Michael

18    McDermott and I represent Richard Collins in

19    reference to a violation of civil rights case that he

20    has filed, and it is in federal court, where the two

21    of you have been named as defendants.

22          Whenever we take depositions, we

23    always give some instructions, that's why I asked to

24    have you both sworn in, to have you both listen now

1  before we start questioning Detective Scott, that way

2  we won't have to do it twice.

3            First of all, Detective, have you ever

4  been deposed before?

5       A.   Yes.

6            MR. McDERMOTT:  Sergeant, have

7       you ever been deposed before?

8            SERGEANT PISAREK:  Yes, sir.

9  BY MR. McDERMOTT:

10      Q.   So, generally speaking, it's a situation in

11  which I'm asking questions and I'm asking the

12  questions orally.  As a result of that, we expect

13  that you answer the questions.  Obviously, if you

14  don't know the answer, just say you don't know and

15  we'll move on from there.  Do you understand that?

16      A.   Yes.

17           MR. McDERMOTT:  Do you

18      understand, Sergeant?

19           SERGEANT PISAREK:  Yes.

20  BY MR. McDERMOTT:

21      Q.   If I ask you something that you don't

22  understand, please tell me that you don't understand

23  it and I can rephrase it in a way that you will

24  understand it.  Do you understand that?

**DETECTIVE KEITH SCOTT**

1    A.    Yes.

2              SERGEANT PISAREK:   Yes.

3    BY MR. McDERMOTT:

4    Q.    Sometimes when attorneys are speaking,

5    including myself, I'll be looking down at paperwork

6    and my voice may tail off or I may not be speaking

7    loud enough.  If you cannot hear me, please stop me,

8    I will speak louder so that you hear the question.

9              Now, if you need to stop because you

10   need to use the bathroom or want to get a drink of

11   water or you want to speak to your attorney,

12   Mr. Shotland, please just let us know, we'll stop and

13   go off the record, you can have a conversation with

14   him and then we'll go back on the record.

15             The only thing I would ask is whatever

16   the last question was that I asked, you answer that

17   before you go discuss it with your attorney.  Do you

18   understand that?

19   A.    Yes.

20             MR. McDERMOTT:   Do you

21        understand that?

22             SERGEANT PISAREK:   Yes.

23   BY MR. McDERMOTT:

24   Q.    Okay.  If we're taking a look at anything

**DETECTIVE KEITH SCOTT**

```
1    exhibit-wise, whether it's one of your police reports
2    or something else, a picture or something, we'll mark
3    it for purposes of the deposition and we'll allow you
4    to see it prior to you answering any questions
5    regarding it.  Do you understand that?
6         A.   Yes.
7              MR. McDERMOTT:  Do you
8         understand that?
9              SERGEANT PISAREK:  Yes.
10   BY MR. McDERMOTT:
11        Q.   Okay.  Do you understand the instructions
12   that I've given you?
13             SERGEANT PISAREK:  Yes.
14             THE WITNESS:  Yes.
15   BY MR. McDERMOTT:
16        Q.   Are either of you under any type of
17   alcohol, narcotic or medication that would keep you
18   from understanding anything I ask today?
19        A.   No.
20             SERGEANT PISAREK:  No.
21   BY MR. McDERMOTT:
22        Q.   We'll start with you, Detective Scott.
23             MR. SHOTLAND:  Just from here on out,
24   this is Detective Scott's deposition?
```

**DETECTIVE KEITH SCOTT**

1           MR. McDERMOTT:  Right.
2           MR. SHOTLAND:  So don't respond
3       to any more questions until it's your
4       turn, Sergeant.
5           SERGEANT PISAREK:  Yeah, I got
6       it.
7   BY MR. McDERMOTT:
8       Q.   Detective, are you familiar with the case
9   regarding Richard Collins, his arrest for an alleged
10  robbery?
11      A.   Yes.
12      Q.   Okay.  What was your assignment regarding
13  his arrest?
14      A.   To process the arrest.
15      Q.   Okay.  So were you out on the scene at any
16  time?
17      A.   Yes.
18      Q.   Okay.  When were you out at the scene?
19      A.   After the robbery took place to actually
20  attempt to get fingerprints or video.
21      Q.   Okay.  Now, I know that you did get
22  fingerprints off of what I believe was a cash
23  register; is that correct?
24      A.   We attempted to get fingerprints, but it

**DETECTIVE KEITH SCOTT**

1    turned out not to be fingerprints.

2         Q.    Okay.  So no fingerprints were recovered?

3         A.    No.

4         Q.    However, that information was not delivered

5    to you until sometime later; is that correct?

6         A.    Yes.

7         Q.    Okay.  I believe that was at around the

8    time that the case was withdrawn by the assistant

9    district attorney; is that correct?

10        A.    I don't remember when.

11        Q.    Okay.  On the night of the incident, you

12   went to the store where the alleged robbery took

13   place; correct?

14        A.    Yes.

15        Q.    And you recovered a video?

16        A.    Yes.

17        Q.    You've had the opportunity to review today

18   the video that -- the surveillance video that came

19   from the store; correct?

20        A.    Yes.

21        Q.    You had the opportunity to review that

22   surveillance video on the night of my client's

23   arrest; is that correct?

24        A.    Yes.

**DETECTIVE KEITH SCOTT**

1    Q.   Okay.  And as a matter of fact, you
2    actually looked at that video while you were still at
3    the store; isn't that correct?
4        A.   Yes.
5        Q.   And that video was in color; right?
6        A.   It wasn't black-and-white, yes.
7        Q.   Okay.  And could you identify the person
8    that was in the video?
9        A.   I couldn't, no.
10       Q.   Okay.  And that's because in the video,
11   there's no time that you really see anyone's face?
12       A.   You only see a partial face.
13       Q.   The perpetrator had a hoodie on at the
14   time, or a coat with a hood, I should say; is that
15   correct?
16       A.   Yes.
17       Q.   Okay.  And from looking at the video and
18   seeing my client that night, you couldn't identify my
19   client as the person from seeing the partial part of
20   his face; is that correct?
21       A.   No, I couldn't.
22       Q.   Okay.  But from looking at the video, you
23   had prepared a report in this matter saying that the
24   sneakers that the perpetrator was wearing matched the

**DETECTIVE KEITH SCOTT**

1    sneakers that my client was wearing; isn't that
2    correct?
3         A.    Yes.   I stated they appeared to match the
4    sneakers that your client was wearing.
5         Q.    Okay.  And you put that into some of your
6    reports; is that correct?
7         A.    Yes.
8         Q.    All right.  I'm going to have you take a
9    look at what we'll have marked as Collins Exhibit 1.
10                   (Discussion held off the
11   record.)
12                   (Scott-1 marked for
13   identification.)
14   BY MR. McDERMOTT:
15        Q.    I'm going to ask you to take a look at what
16   has been marked Exhibit Scott-1.
17        A.    Okay.
18        Q.    Is that a copy of the report that you
19   prepared?
20        A.    Yes, it's a 49.
21        Q.    Okay.  And that's commonly referred to as a
22   75-49; is that correct?
23        A.    That's correct.
24        Q.    And that, in one paragraph there, details

**DETECTIVE KEITH SCOTT**

1   what you put into the report about the sneakers

2   matching; is that correct?

3       A.   Yes.

4       Q.   Can you read for the record exactly what

5   you stated.

6       A.   The assigned, Detective Scott, responded,

7   photographed the scenes and made a copy of the

8   incident, which was caught on store video.  At

9   headquarters, the assigned recovered $93 and dark

10  blue Nike sneakers with white swoosh and sole from

11  the offender.  Sneakers matched those worn in the

12  video.  Detective McReynolds recovered two latent

13  prints from the bottom of the cash register and

14  submitted them to Records and Identification.

15      Q.   Okay.  Now, you have in there that the

16  sneakers matched; correct?

17      A.   Correct.

18      Q.   And these sneakers were placed on a

19  property receipt, the number being 3088459; is that

20  correct?

21      A.   That's correct.

22           MR. McDERMOTT:   I'm going to

23      have this marked as Scott Exhibit 2 and

24      I'll show it to the detective.

**DETECTIVE KEITH SCOTT**

1              (Scott-2 marked for

2    identification.)

3    BY MR. McDERMOTT:

4         Q.   Detective, is that, in fact, the property

5    receipt that the sneakers were put on?

6         A.   Yes.

7         Q.   And in that property receipt, does it once

8    again say that the sneakers matched the sneakers in

9    the video?

10        A.   Yes, in the circumstances.

11        Q.   Now, when you say in the circumstances, you

12   mean in the box that says --

13        A.   Circumstances.

14        Q.   -- circumstances?

15        A.   Correct.

16        Q.   Okay.  And today you saw a copy of the

17   video.  Did you have the opportunity to see the

18   sneakers?

19        A.   Yes.

20        Q.   Okay.  And what is your recall of how the

21   sneakers looked in the video, as you sit here?

22        A.   I recall they still looked the same to me;

23   dark pair of Nike sneakers with a white bottom.

24        Q.   Okay.  That's what they are in the video?

**DETECTIVE KEITH SCOTT**

1      A.    Yes.

2      Q.    Okay.  And you took a photograph of the

3   sneakers; is that correct?

4      A.    Yes.

5      Q.    And I was given some discovery from the

6   incident by Mr. Shotland, and I want to show you that

7   and ask you if that includes all the discovery in the

8   case.

9           MR. SHOTLAND:  I just want to

10      object to that question, as far as he's

11      not going to be able to remember every

12      piece of evidence in the discovery that

13      was turned over.

14           You had a color picture; right?

15           MR. McDERMOTT:  No,

16      black-and-white.  It's not here right

17      now.  I'm going to have to borrow your

18      picture that you copied from me.

19           MR. SHOTLAND:  That's my only

20      copy, so I'll make another copy.

21           MR. McDERMOTT:  Okay.  For the

22      record.

23           MR. SHOTLAND:  Do you want me

24      to do that now?

**DETECTIVE KEITH SCOTT**

1              MR. McDERMOTT:  Yeah, while the

2        officer's looking.

3              MR. SHOTLAND:  It's already

4        been marked as Collins-1, so we don't

5        need to remark it.  So why don't we just

6        use it --

7              MR. McDERMOTT:  Okay.

8              MR. SHOTLAND:  -- and I'll give

9        you a copy at the end.

10   BY MR. McDERMOTT:

11        Q.   Did you go through the paperwork that I've

12   showed you?

13        A.   Yes.

14        Q.   And did you see a photograph of the

15   sneakers in there?

16        A.   I saw a partial photograph.

17        Q.   Okay.  While you're looking through there,

18   you did take a photograph of the sneakers, though;

19   correct?

20        A.   Yes.

21              MR. McDERMOTT:  Off the record.

22              (Discussion held off the

23   record.)

24              THE WITNESS:  It's the last

**DETECTIVE KEITH SCOTT**

1       photograph that's in here.  Is there

2       another one?

3    BY MR. McDERMOTT:

4       Q.   Oh, I'm sorry, Detective, I thought you

5    said that there was one in there.

6       A.   Is there another photograph?  Because this

7    is the last one.  This one?

8       Q.   Okay.  I'm just asking just in that packet

9    you're looking at.

10      A.   Okay.

11      Q.   Okay.  So you didn't see a photograph of

12   the sneakers?

13      A.   Right here.

14      Q.   You believe -- okay.

15      A.   Yeah, it's actually cut off.

16      Q.   Where is that from?

17      A.   Whoever printed this -- from discovery.

18      Q.   Okay.

19      A.   So whoever printed this, if they would have

20   actually went to the top and clicked on it, the whole

21   picture would have printed.

22      Q.   Okay.  So are you saying -- can you take

23   that out for me.

24      A.   Yes.

**DETECTIVE KEITH SCOTT**

1        Q.   Are you saying that picture that you're

2  looking at, that we're going to have --

3        A.   It's not fully printed.

4        Q.   -- marked Scott-3 is from the video of the

5  surveillance?

6        A.   Yes.  Is this a picture I took?  This is

7  also a picture I took.

8        Q.   Okay.  Well, we're going to get to that in

9  one minute.

10        A.   It's the same -- it's the same picture.

11               MR. McDERMOTT:  Can we have

12      this marked as Scott-3.

13               (Scott-3 marked for

14  identification.)

15  BY MR. McDERMOTT:

16        Q.   Okay.  So you told us that Scott-3 is a

17  still shot that was taken from the video showing --

18        A.   No.  Scott-3?

19        Q.   Yes.  The picture --

20        A.   This is not taken from the video.

21        Q.   Where is that taken from?

22        A.   This is taken from either the evidence

23  room -- it's a room in Northeast Detectives.

24        Q.   Okay.  And you recognize the wall --

**DETECTIVE KEITH SCOTT**

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. -- the tiled wall? |
| 3 | Okay. And you're saying that that is |
| 4 | a partial picture of the sneakers that my client was |
| 5 | wearing? |
| 6 | A. Yes. |
| 7 | Q. And that's Scott-3? |
| 8 | A. Yes. |
| 9 | Q. Okay. Now I'm going to show you what has |
| 10 | previously been marked as Collins-1 from his |
| 11 | deposition on April 5th and ask you if you took the |
| 12 | photograph of those sneakers. |
| 13 | A. It's -- yes, it's the same photograph, this |
| 14 | one is just not fully printed -- |
| 15 | Q. Okay. |
| 16 | A. -- and that one is only just actually |
| 17 | showing this. |
| 18 | Q. Okay. Now, I understand that the Collins |
| 19 | photograph is a black-and-white; is that correct? |
| 20 | A. That's correct. |
| 21 | Q. But you can tell the color of the soles of |
| 22 | the sneakers; correct? |
| 23 | A. Yes. |
| 24 | Q. Okay. And you can see the swoosh is also |

**DETECTIVE KEITH SCOTT**

1    white; is that correct?

2         A.    Yes.

3         Q.    Where are the shoelaces?

4         A.    The shoelaces are probably downstairs in

5    the room.

6         Q.    They're taken from somebody after they're

7    arrested; is that correct?

8         A.    Yes.

9         Q.    Do you recall what color they were?

10        A.    I believe they were white.

11        Q.    You believe they were white?

12        A.    Yes.

13        Q.    Okay.  Take a look at Scott-3.  Can you see

14   that the laces are red in that picture?

15        A.    No.  This is not a lace.

16        Q.    Okay.  What is that?

17        A.    It's the writing.

18        Q.    It's the writing.  Okay.  And can you see

19   that there's a blue rim to it?

20        A.    Yes.

21        Q.    Okay.  In the video that you saw earlier

22   today, you're saying that those sneakers match the

23   sneakers in the video?

24        A.    Yes.

**DETECTIVE KEITH SCOTT**

1    Q.   Did you see a white rim on the sole of the
2    shoe in the video?
3        A.   Yes.
4        Q.   Okay.  Did you see a white swoosh in the
5    video?
6        A.   Yes.
7        Q.   Okay.  And they were on the feet of the
8    person who committed the crime?
9        A.   Yes.
10       Q.   And you're saying that they are the
11   sneakers, that they're identical?
12       A.   They appear to be identical to me, that's
13   why I collected them.
14       Q.   Okay.  And that's one of the reasons why
15   Mr. Collins was kept in custody; is that correct?
16       A.   Not correct, no.
17       Q.   Why?  What about them would have made him
18   not go in custody?
19       A.   Nothing about the sneakers.  If -- if I
20   didn't collect the sneakers at all, he would have
21   still been processed because he was positively
22   identified by the complainant.
23       Q.   By who?
24       A.   The complainant.

**DETECTIVE KEITH SCOTT**

1    Q.   Okay.  Where was that done?

2    A.   I wasn't there during the positive

3  identification, but I believe it was done prior to

4  the arrest on -- on -- at a particular location where

5  he was stopped.

6    Q.   Okay.  Now, after he was brought into

7  custody, his sneakers were taken from him; correct?

8    A.   Not directly after.  After I saw the video.

9    Q.   Okay.  And the sneakers, if they didn't

10  match the video, you're saying he would have still

11  been held in custody?

12    A.   Yes.

13    Q.   Why is that?

14    A.   Because he was positively identified by the

15  complainant.

16    Q.   So the only thing of importance to you in

17  making an arrest is the positive identification of --

18              MR. SHOTLAND:  Objection.

19              You can answer.

20              THE WITNESS:  I can answer?

21              MR. SHOTLAND:  You can answer.

22              THE WITNESS:  I wouldn't

23      believe that's important to me, but if

24      there's a positive identification made,

**DETECTIVE KEITH SCOTT**

1        I'm obligated to submit it to the -- to

2        DACU.  They make the final decision.

3   BY MR. McDERMOTT:

4        Q.   Was all of this information sent into DACU?

5        A.   Yes.

6        Q.   For the record, what is DACU?

7        A.   The District Attorney's Charging Unit.

8        Q.   When was that submitted?

9        A.   I have to refer to the paperwork.

10              MR. SHOTLAND:  "That" meaning

11       the case?

12              MR. McDERMOTT:  Yes.

13              THE WITNESS:  At

14       approximately -- approximately, this is

15       approximate, I'm not sure, but 2:31 a.m.,

16       3/24/2013.

17   BY MR. McDERMOTT:

18       Q.   Okay.  So did you send them the video?

19       A.   No.

20       Q.   Did you inform them -- did you -- I'm

21   sorry, did you send them the still pictures?

22       A.   Yes.

23       Q.   Okay.  And what picture did you send them

24   of the sneakers involved?

**DETECTIVE KEITH SCOTT**

1       A.    This one.

2       Q.    And what did you send them that was from

3  the video that showed that the sneakers matched?

4       A.    Eventually they were sent the video, but I

5  don't send the video.

6       Q.    Okay.  But that night when you're sending

7  things over to the District Attorney's Office, you

8  sent a picture of the sneakers?

9       A.    Yes.

10      Q.    Okay.  So the only evidence that you sent

11  them was a picture of the sneakers taken from my

12  client, along with your report that says they match

13  the video?

14      A.    And the statement of the complainant.

15      Q.    Okay.  But the only thing that they get to

16  see is the picture of his sneakers and your report

17  saying that they match that video?

18            MR. SHOTLAND:  Objection.

19       That's not what he said.  He said he sent

20       the statement of the complainant, so

21       that's not the only thing.

22            THE WITNESS:  And the officers.

23  BY MR. McDERMOTT:

24      Q.    Okay.  Regarding -- withdraw that.

**DETECTIVE KEITH SCOTT**

1  Regarding the sneakers, the only thing that was sent
2  to the District Attorney's Charging Unit was the
3  picture you took of my client's sneakers?
4      A.   Yes.
5      Q.   Okay.  There was nothing from the video
6  sent?
7      A.   Not that night, no.
8      Q.   Okay.  And when was my client charged with
9  the crime?
10     A.   I don't know exactly when he was charged.
11     Q.   Well, was it before or after that you sent
12  the video?
13     A.   I didn't send the video.  We have people
14  who collect and send videos to DACU, so I don't know
15  exactly when they received the video --
16     Q.   Well, were they --
17     A.   -- but I sent the paperwork prior to them
18  receiving the video.  That's all I can tell you.
19     Q.   And in regard to the sneakers --
20     A.   Uh-huh.
21     Q.   -- the paperwork that you sent said that
22  the sneakers matched the sneakers in the surveillance
23  video?
24     A.   Yes.

**DETECTIVE KEITH SCOTT**

1        Q.    Okay.  So what the D.A. had to rely on at

2    that time in regard to certain evidence of the

3    sneakers was the picture you sent and your statement

4    saying that they were the same?

5        A.    And the statements from --

6        Q.    I'm saying specifically regarding the

7    sneakers, Detective.

8                    MR. SHOTLAND:  He should be

9        allowed to answer.

10                   MR. McDERMOTT:  He can answer

11       after he answers my question.

12   BY MR. McDERMOTT:

13       Q.    With regard to the sneakers, that's all

14   they received; is that correct?

15       A.    I don't understand what you're asking now

16   with regard to the sneakers.

17       Q.    With regard to the sneakers, all they got

18   sent from you was the picture of the sneakers that

19   you took, which is in Collins-1, and you sending over

20   paperwork saying the sneakers matched?

21       A.    Now, what time frame?  Because that's not

22   the only thing they received.  Eventually they

23   received the video, too.

24       Q.    When you sent it over for the charging unit

**DETECTIVE KEITH SCOTT**

1    to make a decision as to whether to charge or not to

2    charge my client, all they had, which you sent, was

3    the picture of the sneakers and your statement saying

4    that they matched the sneakers in the video.

5              MR. SHOTLAND:  Objection.

6              You can answer.

7              THE WITNESS:  Yes, as far as

8         the sneakers are concerned, they were

9         sent a picture of the sneakers.

10   BY MR. McDERMOTT:

11        Q.   Okay.  And they were sent your statement

12   saying that they matched?

13        A.   Yes.

14        Q.   Okay.  And they were sent the different

15   interviews that you took?

16        A.   Yes.

17        Q.   Okay.  And where was my client arrested?

18        A.   I don't know.

19        Q.   How was he arrested?

20        A.   According to the paperwork, on the 7500

21   block of Torresdale Avenue.

22        Q.   What paperwork are you looking at?

23        A.   The preliminary arrest report, the PARS.

24        Q.   Okay.  May I see what you're looking at.

**DETECTIVE KEITH SCOTT**

1      A.    Yes.

2      Q.    So it just gives a location; is that

3   correct?

4      A.    Yes.

5      Q.    Does it state whether my client was on

6   foot, walking?  Was he in a vehicle?  Does it state

7   anything to that?

8      A.    No.

9      Q.    Okay.  Did anybody tell you where he was

10  arrested, in reference to whether he was in a motor

11  vehicle or whether he was on foot?

12     A.    If so, it would probably be in one of the

13  interviews.

14     Q.    Did you take an interview of Sergeant -- of

15  the sergeant?

16     A.    Let's see.  I don't see the sergeant's

17  interview, unless he wasn't a sergeant then.

18             MR. SHOTLAND:  To the best of

19      your recollection, did you interview him?

20             THE WITNESS:  I don't know.

21  BY MR. McDERMOTT:

22     Q.    All right.  Would you have normally, in the

23  course of an investigation, interviewed an officer

24  such as Sergeant Pisarek, who was involved in the

DETECTIVE KEITH SCOTT

```
 1    arrest of my client?
 2         A.    If he was working with somebody.  I don't
 3    know if -- if they're -- if they're paired up, I
 4    would only interview one officer.
 5         Q.    Okay.  So on that night, he was partners
 6    with Police Officer Berkery.
 7                   MR. McDERMOTT:  And I'm going
 8         to spell that for you.
 9                   MR. SHOTLAND:  B-E-R-K-E-R-Y.
10    BY MR. McDERMOTT:
11         Q.    Did you interview Officer Berkery?
12         A.    No.
13         Q.    I'm going to show you what we'll have
14    marked as Scott-4.
15                   (Scott-4 marked for
16    identification.)
17    BY MR. McDERMOTT:
18         Q.    Take a look at that.
19         A.    Yes.
20         Q.    Do you recognize what that is?
21         A.    Yes.
22         Q.    All right.  For the record, tell us what
23    that is.
24         A.    It's a 75-483.  It's an interview sheet.
```

**DETECTIVE KEITH SCOTT**

1          Q.    Does it tell you who the interviewee is?

2          A.    Yes.

3          Q.    Who is that?

4          A.    Detective Dewey, Badge 501.

5          Q.    Okay.  That's the interviewer.  Who's the

6     interview taken of?

7          A.    P.O. Michael Berkery.

8          Q.    Okay.  And who took the interview?

9          A.    Detective Dewey, Badge No. 501.

10         Q.    And who is Detective Dewey?

11         A.    He's a detective in Northeast Detectives.

12         Q.    Okay.  Did you see a copy of that report

13    before you sent things over to the D.A.'s office?

14         A.    Yes.

15         Q.    Did you send that report over to the D.A.'s

16    office?

17         A.    Yes.

18         Q.    Okay.  What does Officer Berkery say about

19    where he stopped my client?

20         A.    7500 block of Torresdale Avenue.

21         Q.    Does it state whether he was in a motor

22    vehicle or on foot?

23         A.    No, it doesn't.

24         Q.    Okay.  What was the flash information given

**DETECTIVE KEITH SCOTT**

1    out in reference to a description of the person

2    involved?

3         A.   I don't know.

4         Q.   Do you have that in any of your paperwork?

5         A.   Wait.  According to Michael Berkery's

6    interview, the flash information was a white male,

7    approximately six feet, green eyes, black jacket with

8    fur on hood and blue jeans.

9         Q.   Okay.  The person that --

10        A.   Wait.  Wait.  Hold on.  Yeah.  Okay.

11        Q.   Everything that happens we kind of put on

12   the record.

13             You're looking at a second interview?

14        A.   This --

15        Q.   Is that the same interview?

16        A.   It's the same exact interview.

17        Q.   Okay.  And when Officer Berkery stopped my

18   client, is that what he was wearing?

19        A.   I don't know.  I'd have to find out.

20        Q.   How do you find that out?

21        A.   According to the 75-229, the biographical

22   information report, he was wearing a grey hoodie,

23   jeans and blue Nike sneakers.

24        Q.   Okay.  And does that match what the

**DETECTIVE KEITH SCOTT**

1  description was that he put in there?

2      A.   No.   This doesn't match the information

3  according to Police Officer Berkery.

4      Q.   Okay.   Now, this is the biographical

5  information report, what's commonly referred to as

6  the 229.   That's what my client would have been

7  wearing when he was arrested; correct?

8      A.   Yes.

9      Q.   Okay.   And it says blue Nike sneakers; is

10  that correct?

11      A.   Yes.

12      Q.   So the sneakers that he was wearing would

13  be blue?

14      A.   Yes.

15      Q.   Okay.   And you're saying that the sneakers

16  in the video that you saw earlier were blue?

17      A.   I'm saying they're dark.

18      Q.   They're dark?

19      A.   Yes.

20      Q.   And a hoodie is not a parka; would you

21  agree with me?

22      A.   No.   I mean, yes, I would.   It's not a

23  parka.

24      Q.   And did you interview anybody else?

**DETECTIVE KEITH SCOTT**

1        A.    The complainant.

2        Q.    Okay.  And when did you interview the

3    complainant?

4        A.    On March 23rd, 2013, at approximately

5    10:00 p.m.

6        Q.    And was that in the police station, in the

7    detective's --

8        A.    Yes.

9        Q.    -- office?

10        A.    Yes.

11        Q.    Did you show the complainant the sneakers

12    that are in Collins-1?

13        A.    No.

14        Q.    Did you and the complainant look at the

15    video together?

16        A.    No.  Wait.  Hold on.  I think we possibly

17    did, which was -- it wasn't the same night, though.

18    It was either a day -- probably the day after.

19        Q.    The day after?

20        A.    Maybe the day after or -- I can't tell you

21    the exact date.  She was there when I actually

22    recovered the video.

23        Q.    I thought you got the video the night of

24    the incident.

**DETECTIVE KEITH SCOTT**

```
1          A.   No, I didn't say I got the video the night
2     of the incident.
3          Q.   When did you get the video?
4          A.   Either the day -- the day after -- I can't
5     tell you the exact date.
6          Q.   Okay.  So you're saying you didn't recover
7     the video, but you observed the video?
8          A.   Yes.
9          Q.   So you observed it at the store --
10         A.   Observed the video, and I made a copy of it
11    with either my camera or cell phone.
12              MR. SHOTLAND:  Just try to wait
13         until he's done with his question --
14              THE WITNESS:  Oh, okay.
15              MR. SHOTLAND:  -- before you
16         answer.
17              THE WITNESS:  I'm sorry.
18    BY MR. McDERMOTT:
19         Q.   So when you went back to the police station
20    the night of the arrest, you did have some form of
21    copy of the video?
22         A.   Yes.
23         Q.   Okay.  But you didn't actually get the
24    video from the store for a couple days?
```

**DETECTIVE KEITH SCOTT**

1      A.   It was in Mandarin, so I couldn't -- I

2   couldn't translate it, so I had to get our video

3   people to actually go out and recover the video.

4      Q.   But you took her statement --

5      A.   Yes.

6      Q.   -- the same night at the police station?

7      A.   Yes.

8      Q.   And did you make any notes or anything of

9   when you reviewed the video with her?

10      A.   No.

11      Q.   Okay.  And there was a jacket that was

12   recovered, and that was placed on property receipt

13   3090993.  Do you see a copy of that property receipt

14   there?

15      A.   Yes.

16      Q.   Okay.  And it has description of evidence.

17   What is that evidence?

18      A.   One tan U.S. Polo coat with brown fur

19   around its collar, with a black patch on the

20   shoulder.

21      Q.   And where was that recovered at?

22      A.   From 4565 Aldine Street, on the highway.

23      Q.   And 4665 (sic) Aldine, where is that in

24   relation to 7500 Torresdale, if you know?

1       A.    It's not too far from the location of the
2    occurrence.  Well, I don't know.  I'm thinking of the
3    location of occurrence.  I'm not sure how far is it
4    from the 7500 block of Torresdale.
5       Q.    Okay.  But it is close to the 4500 block of
6    Cottman, where the robbery took place?
7       A.    Yes.
8       Q.    Okay.  Do you know the whereabouts -- is it
9    in the same direction from 4500 Cottman as --
10      A.    I would need a map.
11      Q.    Okay.  Now, on property receipt 3090994 was
12   placed a black Sport 105 BB plastic gun.
13      A.    Yes.
14      Q.    That was recovered from 4565 Aldine Street,
15   also?
16      A.    Yes.
17      Q.    And you weren't present for the recovery of
18   that jacket or that gun?
19      A.    I photographed them, but I wasn't present
20   when they were actually taken off the ground.
21      Q.    Okay.  Now, on property receipt 3088458,
22   there was evidence that was taken from my client
23   which consisted of currency; is that correct?
24      A.    Yes.

**DETECTIVE KEITH SCOTT**

1     Q.    And how much in total was taken from him?

2     A.    $93.

3     Q.    Okay.  And that consisted of four 20-dollar

4     bills, one 10-dollar bill and three one-dollar bills;

5     is that correct?

6     A.    Yes.

7     Q.    How much money were you told was taken from

8     the store?

9     A.    According to the complainant's statement,

10    approximately $200.

11    Q.    At what point in time did the complainant

12    identify my client?

13    A.    I don't know when.  I'd have to find it in

14    the paperwork.  I have no idea when -- the exact time

15    when he was positively identified.

16    Q.    Was it before or after you spoke to her?

17    A.    Before.

18    Q.    And was that before you spoke to her at the

19    store or before you spoke to her in the detective's

20    office?

21    A.    Before I spoke to her at Northeast

22    Detectives.

23    Q.    Okay.  Was it before or after you spoke to

24    her at the store?

**DETECTIVE KEITH SCOTT**

1      A.    I didn't speak to her -- the first time I

2   spoke to her was at Northeast Detectives.

3      Q.    Okay.  Now, taking a look at her

4   description in your interview, what was her

5   description?

6      A.    White male, he had on a tan coat and he had

7   a beard.

8      Q.    Okay.  At the time you were taking this

9   statement, she's already identified the person;

10   correct?

11      A.    Yes.

12      Q.    And you're asking her whether she can

13   describe the person who pointed the weapon at her?

14      A.    Yes.

15      Q.    And even after seeing him in police

16   custody, all she can give you is white male, had on a

17   tan coat and had a beard?

18      A.    That was her answer, white male, tan coat

19   and a beard.

20      Q.    Okay.  Where did the -- there was no

21   description of height or anything of that nature?

22      A.    In the interview, no.  As far as the flash

23   during the radio call, I'm not sure.

24      Q.    Okay.  And Berkery's statement, does he

**DETECTIVE KEITH SCOTT**

1      tell you about height?

2          A.    Yes.

3          Q.    And what does he say about the height?

4                    MR. SHOTLAND:  He didn't

5          interview Berkery; right?

6                    THE WITNESS:  No.

7      BY MR. McDERMOTT:

8          Q.    I'm sorry, in the interview of Berkery by

9      your fellow detective.

10         A.    In the interview, it says six feet.

11         Q.    Okay.  Where did that information come

12     from?

13         A.    I'm not sure.  I don't know.

14         Q.    Is there any police paperwork that would

15     show you what the description was from the radio

16     flash?  Let me show you what we'll have marked as

17     Scott-5.

18                    (Scott-5 marked for

19     identification.)

20     BY MR. McDERMOTT:

21         Q.    It may be easier if I just hand it to you.

22     What is Scott 55?

23         A.    A 75-48.

24         Q.    And what is a 75-48?

**DETECTIVE KEITH SCOTT**

1      A.    It's a 75-48A, excuse me.  It's a form that
2  officers have to fill out when they do a pedestrian
3  investigation.
4      Q.    Okay.
5      A.    That's when they stop somebody on the
6  street or in a vehicle.
7      Q.    Okay.  In that, does it tell you what the
8  flash information was?
9      A.    Grey hoodie, black jacket with fur on the
10  hood and blue jeans.
11      Q.    Okay.  The jacket that was found was not
12  black, was it?
13      A.    No.
14      Q.    And my client wasn't wearing a black jacket
15  when he was arrested, was he?
16              MR. SHOTLAND:  Objection.
17              You can answer.
18              THE WITNESS:  As far as the
19         paperwork, he was wearing a grey hoodie.
20  BY MR. McDERMOTT:
21      Q.    Okay.  And does that flash information give
22  any type of height description?
23      A.    No.
24      Q.    Okay.  So can you tell from looking at that

1    report that's been marked as Scott-5, who prepared

2    that?

3         A.    Officer Berkery -- or Pisarek.

4         Q.    Okay.  And does that give any detail, other

5    than white male, black jacket, blue jeans, as the

6    flash?

7         A.    Well, in the flash it says grey hoodie,

8    black jacket with fur on it and blue jeans.

9         Q.    The description on there as to the flash

10   and the description that Berkery put in his statement

11   when he was interviewed, does that match?

12        A.    Repeat that question again.

13        Q.    Well, we'll do it the simple way.  We'll --

14        A.    All right.  Go ahead.

15        Q.    -- compare the two.  Let's start with the

16   interview of Berkery is Scott-4.

17        A.    Uh-huh.

18        Q.    And what is the description he has in

19   there?

20        A.    White male, six-foot, green eyes, black

21   jacket with fur on hood and blue jeans.

22        Q.    Okay.  The description that's in the flash

23   information, what's that?

24        A.    Grey hoodie, black jacket with fur on hood,

**DETECTIVE KEITH SCOTT**

1    blue jeans.

2         Q.    Okay.  So neither description fits what my

3    client was wearing at the time; is that correct?  You

4    can take a look at the 229.

5         A.    229.  According to the 229, grey hoodie and

6    jeans are the only things that match with the flash

7    and what your client was wearing.

8         Q.    Was the jeans?

9         A.    Jeans and the grey hoodie.

10        Q.    The black jacket?

11        A.    Not the black -- not the black jacket, the

12   grey hoodie and the jeans.

13        Q.    What about the grey hoodie?

14        A.    It matches the flash information.

15        Q.    What's the flash?

16        A.    Grey hoodie.

17        Q.    And blue jeans?

18        A.    And jeans, blue jeans.

19        Q.    Okay.  But no black jacket?

20        A.    No black jacket.

21        Q.    And no description of the sneakers?

22        A.    No.

23        Q.    And nothing about the height?

24        A.    No.

**DETECTIVE KEITH SCOTT**

1    Q.    Excuse me one second.

2              Now, the flash information that's put

3    into the 229 is written down by the police officer,

4    either Sergeant Pisarek, who's sitting here, or

5    Officer Berkery?

6    A.    Yes.

7    Q.    And how does that coincide with the

8    description that you were given by the complainant?

9    A.    White male, had on a tan coat and beard.

10   Q.    Okay.  So that's different?

11   A.    Yes.

12   Q.    So if you can answer, why would an officer

13   stop somebody with that description when it's not the

14   description given by the complainant?

15   A.    I can't answer that.  I can only -- he had

16   contact with the complainant, so I don't know, maybe

17   the complainant told him something while he spoke

18   directly to her.  That's the only thing I can say,

19   but --

20   Q.    Did you --

21   A.    -- other than that, I'm just guessing.

22   Q.    Did you obtain a copy of the police radio

23   tape?

24   A.    I don't know if I did.  I'm not sure.  If

**DETECTIVE KEITH SCOTT**

1    there is, the D.A.'s office may have it.

2        Q.   That's something that would be handed over

3    to the D.A.'s office?

4        A.   Yes.

5        Q.   Here's something I actually want to clear

6    up for the record.  Earlier on I was asking you to

7    look at a packet of information.  That packet was

8    given to me by Mr. Shotland.

9        A.   Okay.

10       Q.   Did that packet come from you to

11   Mr. Shotland?

12               MR. SHOTLAND:  Objection.  Do

13          you mean in terms of information he's

14          produced to his attorney?

15   BY MR. McDERMOTT:

16       Q.   Producing that information -- did you

17   produce --

18               MR. SHOTLAND:  He's not going

19          to answer that.

20   BY MR. McDERMOTT:

21       Q.   Did you produce any information regarding

22   this case, paperwork, to Mr. Shotland?

23               MR. SHOTLAND:  Objection.

24               Don't answer.

**DETECTIVE KEITH SCOTT**

1            MR. McDERMOTT:  I don't
2       understand your objection.
3            MR. SHOTLAND:  Information that
4       my client is supplying to me is not
5       discoverable by you, it's subject to
6       attorney/client privilege.
7            MR. McDERMOTT:  Information
8       that your client gave to you, that's
9       public information, it is not
10      attorney/client.
11           MR. SHOTLAND:  What's public
12      about it?
13           MR. McDERMOTT:  The case -- the
14      police reports, they're all public
15      information, they've been made part of a
16      record in court.  They're not
17      confidential or secretive in any way.  In
18      any case, do you have a copy of --
19           MR. SHOTLAND:  Of what?
20           MR. McDERMOTT:  The radio tape.
21           MR. SHOTLAND:  No.  Do you?
22           MR. McDERMOTT:  No, I don't,
23      actually.
24           This is page 2.  Where's

**DETECTIVE KEITH SCOTT**

| | |
|---|---|
| 1 | page 1?  Oh, no, I'm sorry. |
| 2 | BY MR. McDERMOTT: |
| 3 | Q.   I want you to take a look at -- there's an |
| 4 | investigation interview record of Police Officer |
| 5 | Apostolou, and we'll have that marked as Scott-6. |
| 6 | (Scott-6 marked for |
| 7 | identification.) |
| 8 | BY MR. McDERMOTT: |
| 9 | Q.   Taking a look at Scott-6, that's an |
| 10 | interview of who? |
| 11 | A.   Police Officer Apostolou. |
| 12 | Q.   And does that have -- who took that |
| 13 | interview of him or her? |
| 14 | A.   Detective Lena Allen, Badge No. 656. |
| 15 | Q.   And in that report -- did you see that |
| 16 | report and send it to the D.A.'s office? |
| 17 | A.   Yes. |
| 18 | Q.   Okay.  In that report, does it say what the |
| 19 | flash information was? |
| 20 | A.   Yes. |
| 21 | Q.   And what is the flash information? |
| 22 | A.   We received flash information over police |
| 23 | radio of the suspect, a white male wearing tan coat |
| 24 | with fur around the hood, armed with a black gun. |

**DETECTIVE KEITH SCOTT**

```
1        Q.    Okay.  At the time, if you recall reviewing
2   the tapes, was there more than one description given
3   out of my client through -- or not of my client, but
4   of the perpetrator, who did the flash information?
5        A.    Well, reviewing what tapes?
6        Q.    The radio tapes.
7        A.    I never reviewed the radio tape.
8        Q.    Okay.  Do you know whether there was more
9   than one description given out?
10       A.    No.
11               MR. SHOTLAND:  Given out,
12       meaning over radio?
13               MR. McDERMOTT:  Over radio?
14               THE WITNESS:  No.
15   BY MR. McDERMOTT:
16       Q.    Was -- were you present -- well, strike
17   that.
18               Do you know who put the flash
19   information out over the radio?
20       A.    No.
21       Q.    Do you know where that information came
22   from?
23       A.    It would probably come from one of the
24   first officers who arrived on the scene.
```

**DETECTIVE KEITH SCOTT**

1       Q.   Okay.  And they would have talked to who,

2  the complainant?

3       A.   Yes.

4       Q.   Okay.  And was the complainant alone at the

5  store at the time when police responded?

6       A.   I can only -- I'm not sure.

7       Q.   Okay.  You saw the video earlier today;

8  right?

9       A.   Yes.

10      Q.   And you saw in that video -- did you see in

11  that video that there were two other people inside

12  the store at some point?

13      A.   Yes.

14      Q.   Okay.  Do you know who they are?

15      A.   No.

16      Q.   Were they ever interviewed?

17      A.   No.  They ran out of the store.

18      Q.   Okay.  So they were not there when police

19  arrived?

20      A.   No.

21      Q.   Okay.  And as potential witnesses, they

22  would have been held, if they were there, for you to

23  interview?

24      A.   Yes.

**DETECTIVE KEITH SCOTT**

1     Q.   Or, at the very least, their identification

2  and their contact information would have been taken?

3     A.   Yes.

4     Q.   Okay.  So is it fair to say that the

5  information didn't come from them?

6     A.   Yes.

7     Q.   Okay.  So it had to come from --

8     A.   The complainant.

9     Q.   -- the complainant.

10          MR. McDERMOTT:  I have no other

11     questions.

12                  -  -  -

13               EXAMINATION

14                  -  -  -

15  BY MR. SHOTLAND:

16     Q.   Earlier you testified about people sending

17  videos to DACU?

18     A.   Uh-huh.

19     Q.   Who was that?

20     A.   Our video officers, DVRT team, Video --

21  Digital Video -- Digital Video Response Team,

22  something like that, they sent it to DACU.

23     Q.   And is that the process in every case where

24  that's being sent to DACU, that you send the

**DETECTIVE KEITH SCOTT**

1    paperwork and they send the video?
2        A.    Yeah, they recover the video and send it to
3    DACU.  Yes.
4        Q.    You didn't purposefully withhold the video
5    from the D.A.'s office, did you?
6        A.    No.
7                    MR. SHOTLAND:  That's all I
8            have.
9                    MR. McDERMOTT:  Just a point of
10           clarification, should we make this a
11           copy?
12                    MR. SHOTLAND:  Sure.
13                    MR. McDERMOTT:  I mean, does it
14           really matter?
15                    MR. SHOTLAND:  Well that -- so
16           you've referred to that as Collins-1.
17                    MR. McDERMOTT:  That's a copy
18           of this.
19                    MR. SHOTLAND:  Yeah, that's a
20           better copy.
21                    MR. McDERMOTT:  Do you want to
22           make a copy of this?
23                    MR. SHOTLAND:  Do you want to
24           call it something different or do you

**DETECTIVE KEITH SCOTT**

```
1          want to call it --
2                    MR. McDERMOTT:  We can make it
3          Collins-1.
4                    (Collins-1 marked for
5      identification.)
6                    (Deposition concluded at 2:08
7      p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**DETECTIVE KEITH SCOTT**

1                          CERTIFICATION
2                              - - -
3              I hereby certify that the testimony and the
4    proceedings in the aforegoing matter are contained
5    fully and accurately in the stenographic notes taken
6    by me, and that the copy is a true and correct
7    transcript of the same.
8
9
10
11
12              *Andrea M. Brinton*
13    ------------------------------
14              Andrea M. Brinton, Certified
                Court Reporter and Notary Public
15
16
17
18
19              The foregoing certification does not apply
20    to any reproduction of the same by any means, unless
21    under the direct control and/or supervision of the
22    certifying reporter.
23
24

# LAWYER'S NOTES

| Page | Line | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**A**
a.m 22:15
AARON 2:6
able 14:11
accurately 51:5
ACTION 1:4
aforegoing 51:4
afternoon 4:17
agree 31:21
agreement 4:1
ahead 40:14
al 1:7
alcohol 7:17
Aldine 34:22,23 35:14
alleged 8:9 9:12
Allen 45:14
allow 7:3
allowed 25:9
and/or 51:21
Andrea 1:16 51:13
answer 5:13,14 6:16 21:19,20,21 25:9,10 26:6 33:16 37:18 39:17 42:12,15 43:19,24
answering 7:4
answers 25:11
anybody 27:9 31:24
anyone's 10:11
Apostolou 45:5,11
appear 20:12
APPEARANCES 2:1
appeared 11:3
apply 51:19
approximate 22:15
approximately 22:14,14 30:7 32:4 36:10
April 1:15 18:11
Arch 1:14 2:7
armed 45:24
arrest 8:9,13,14 9:23 21:4,17 26:23 28:1 33:20
arrested 19:7 26:17 26:19 27:10 31:7 39:15
arrived 46:24 47:19
asked 4:23 6:16
asking 5:11,11 16:8 25:15 37:12 43:6
assigned 12:6,9
assignment 8:12
assistant 9:8
attempt 8:20

attempted 8:24
attorney 6:11,17 9:9 43:14
Attorney's 22:7 23:7 24:2
attorney/client 44:6 44:10
attorneys 6:4
Avenue 26:21 29:20

**B**
B 3:8
B-E-R-K-E-R-Y 28:9
back 6:14 33:19
Badge 29:4,9 45:14
bathroom 6:10
BB 35:12
beard 37:7,17,19 42:9
believe 8:22 9:7 16:14 19:10,11 21:3,23
Berkery 28:6,11 29:7,18 30:17 31:3 38:5,8 40:3 40:10,16 42:5
Berkery's 30:5 37:24
best 27:18
better 49:20
bill 36:4
bills 36:4,4
biographical 30:21 31:4
black 30:7 34:19 35:12 39:9,12,14 40:5,8,20,24 41:10,11,11,19,20 45:24
black-and-white 10:6 14:16 18:19
block 26:21 29:20 35:4,5
blue 12:10 19:19 30:8,23 31:9,13 31:16 39:10 40:5 40:8,21 41:1,17 41:18
borrow 14:17
bottom 12:13 13:23
box 13:12
Brinton 1:17 51:13
brought 21:6
brown 34:18
Building 1:14

**C**
call 37:23 49:24 50:1
camera 33:11
case 4:19 8:8 9:8 14:8 22:11 43:22 44:13,18 48:23
cash 8:22 12:13
caught 12:8
cell 33:11
certain 25:2
certification 4:2 51:1,19
Certified 1:17,21 51:13
certify 51:3
certifying 51:22
charge 26:1,2
charged 24:8,10
charging 22:7 24:2 25:24
circumstances 13:10,11,13,14
City 1:7,13 2:6
civil 1:4 4:19
clarification 49:10
clear 43:5
clicked 16:20
client 10:18,19 11:1 11:4 18:4 23:12 24:8 26:2,17 27:5 28:1 29:19 30:18 31:6 35:22 36:12 39:14 41:3,7 44:4 44:8 46:3,3
client's 9:22 24:3
close 35:5
coat 10:14 34:18 37:6,17,18 42:9 45:23
coincide 42:7
collar 34:19
collect 20:20 24:14
collected 20:13
Collins 1:4 2:11 4:18 8:9 11:9 18:18 20:15
Collins-1 3:20 15:4 18:10 25:19 32:12 49:16 50:3,4
color 10:5 14:14 18:21 19:9
come 38:11 43:10 46:23 48:5,7
commencing 1:16
committed 20:8
commonly 11:21

31:5
compare 40:15
complainant 20:22 20:24 21:15 23:14 23:20 32:1,3,11 32:14 36:11 42:8 42:14,16,17 47:2 47:4 48:8,9
complainant's 36:9
concerned 26:8
concluded 50:6
confidential 44:17
consisted 35:23 36:3
contact 42:16 48:2
contained 51:4
control 51:21
conversation 6:13
copied 14:18
copy 11:18 12:7 13:16 14:20,20 15:9 29:12 33:10 33:21 34:13 42:22 44:18 49:11,17,20 49:22 51:6
correct 8:23 9:5,9 9:13,19,23 10:3 10:15,20 11:2,6 11:22,23 12:2,16 12:17,20,21 13:15 14:3 15:19 18:19 18:20,22 19:1,7 20:15,16 21:7 25:14 27:3 31:7 31:10 35:23 36:5 37:10 41:3 51:6
Cottman 35:6,9
counsel 2:5,9 4:1
couple 33:24
course 27:23
court 1:1,17,21,21 4:20 44:16 51:14
crime 20:8 24:9
currency 35:23
custody 20:15,18 21:7,11 37:16
cut 16:15

**D**
D 3:1
D.A 25:1
D.A.'s 29:13,15 43:1,3 45:16 49:5
DACU 22:2,4,6 24:14 48:17,22,24 49:3
dark 12:9 13:23

31:17,18
date 32:21 33:5
day 32:18,18,19,20 33:4,4
days 33:24
decision 22:2 26:1
defendants 1:8 2:9 4:21
delivered 9:4
Department 1:13 2:6 3:11,17
deposed 5:4,7
deposition 1:12 7:3 7:24 18:11 50:6
depositions 4:22
describe 37:13
description 3:10 30:1 31:1 34:16 37:4,5,21 38:15 39:22 40:9,10,18 40:22 41:2,21 42:8,13,14 46:2,9
detail 40:4
details 11:24
detective 1:12 3:3 4:6 5:1,3 7:22,24 8:8 12:6,12,24 13:4 16:4 25:7 29:4,9,10,11 38:9 45:14
detective's 32:7 36:19
Detectives 17:23 29:11 36:22 37:2
Dewey 29:4,9,10
different 26:14 42:10 49:24
Digital 48:21,21
direct 51:21
direction 35:9
directly 21:8 42:18
discoverable 44:5
discovery 14:5,7,12 16:17
discuss 6:17
Discussion 11:10 15:22
district 1:1,1 9:9 22:7 23:7 24:2
downstairs 19:4
drink 6:10
duly 4:7,11
DVRT 48:20

**E**
E 3:1,8
earlier 19:21 31:16

DETECTIVE KEITH SCOTT

43:6 47:7 48:16
easier 38:21
**EASTERN** 1:1
**Edward** 2:11 4:10
either 7:16 17:22
    32:18 33:4,11
    42:4
**ESQUIRE** 2:2,6
et 1:7
**Eventually** 23:4
    25:22
evidence 14:12
    17:22 23:10 25:2
    34:16,17 35:22
exact 30:16 32:21
    33:5 36:14
exactly 12:4 24:10
    24:15
**EXAMINATION** 3:4
    4:14 48:13
examined 4:7,11
excuse 39:1 42:1
**Exhibit** 3:10 11:9
    11:16 12:23
exhibit-wise 7:1
expect 5:12
eyes 30:7 40:20

**F**
face 10:11,12,20
fact 10:1 13:4
fair 48:4
familiar 8:8
far 14:10 26:7 35:1
    35:3 37:22 39:18
federal 4:20
feet 20:7 30:7 38:10
fellow 38:9
filed 4:20
filing 4:2
fill 39:2
final 22:2
find 30:19,20 36:13
fingerprints 8:20
    8:22,24 9:1,2
first 3:9 4:7,11 5:3
    37:1 46:24
fits 41:2
flash 29:24 30:6
    37:22 38:16 39:8
    39:21 40:6,7,9,22
    41:6,14,15 42:2
    45:19,21,22 46:4
    46:18
**Fleming** 1:23
**Floor** 1:14 2:8
follows 4:8,12

foot 27:6,11 29:22
foregoing 51:19
form 4:3 33:20 39:1
found 39:11
four 36:3
frame 25:21
fully 17:3 18:14
    51:5
fur 30:8 34:18 39:9
    40:8,21,24 45:24

**G**
generally 5:10
give 4:23 15:8
    37:16 39:21 40:4
given 7:12 14:5
    29:24 42:8,14
    43:8 46:2,9,11
gives 27:2
go 6:13,14,17 15:11
    20:18 34:3 40:14
going 11:8,15 12:22
    14:11,17 17:2,8
    18:9 28:7,13
    43:18
**Good** 4:17
green 30:7 40:20
grey 30:22 39:9,19
    40:7,24 41:5,9,12
    41:13,16
ground 35:20
guessing 42:21
gun 35:12,18 45:24

**H**
**H** 3:8
**Hammonton** 1:23
hand 38:21
handed 43:2
happens 30:11
headquarters 12:9
hear 6:7,8
height 37:21 38:1,3
    39:22 41:23
held 11:10 15:22
    21:11 47:22
highway 34:22
**Hold** 30:10 32:16
hood 10:14 30:8
    39:10 40:21,24
    45:24
hoodie 10:13 30:22
    31:20 39:9,19
    40:7,24 41:5,9,10
    41:13,16

**I**

idea 36:14
identical 20:11,12
**identification** 11:13
    12:14 13:2 17:14
    21:3,17,24 28:16
    38:19 45:7 48:1
    50:5
identified 20:22
    21:14 36:15 37:9
identify 10:7,18
    36:12
importance 21:16
important 21:23
incident 9:11 12:8
    14:6 32:24 33:2
includes 14:7
including 6:5
inform 22:20
information 9:4
    22:4 29:24 30:6
    30:22 31:2,5
    38:11 39:8,21
    40:23 41:14 42:2
    43:7,13,16,21
    44:3,7,9,15 45:19
    45:21,22 46:4,19
    46:21 48:2,5
inside 47:11
instructions 4:23
    7:11
interview 3:15,19
    27:14,17,19 28:4
    28:11,24 29:6,8
    30:6,13,15,16
    31:24 32:2 37:4
    37:22 38:5,8,10
    40:16 45:4,10,13
    47:23
interviewed 27:23
    40:11 47:16
interviewee 29:1
interviewer 29:5
interviews 26:15
    27:13
investigation 3:11
    3:15,17,19 27:23
    39:3 45:4
involved 22:24
    27:24 30:2

**J**
jacket 30:7 34:11
    35:18 39:9,11,14
    40:5,8,21,24
    41:10,11,19,20
jeans 30:8,23 39:10
    40:5,8,21 41:1,6,8

41:9,12,17,18,19
**Jersey** 1:23

**K**
keep 7:17
**KEITH** 1:12 3:3 4:6
kept 20:15
kind 30:11
know 5:14,14 6:12
    8:21 24:10,14
    26:18 27:20 28:3
    30:3,19 34:24
    35:2,8 36:13
    38:13 42:16,24
    46:8,18,21 47:14

**L**
lace 19:15
laces 19:14
latent 12:12
**Law** 1:13 2:2,6
**Lena** 45:14
**Let's** 27:16 40:15
listen 4:24
location 21:4 27:2
    35:1,3
look 6:24 11:9,15
    19:13 28:18 32:14
    37:3 41:4 43:7
    45:3,9
looked 10:2 13:21
    13:22
looking 6:5 10:17
    10:22 15:2,17
    16:9 17:2 26:22
    26:24 30:13 39:24
loud 6:7
louder 6:8

**M**
**M** 1:16 51:13
making 21:17
male 30:6 37:6,16
    37:18 40:5,20
    42:9 45:23
**Mandarin** 34:1
map 35:10
**March** 32:4
mark 7:2
marked 11:9,12,16
    12:23 13:1 15:4
    17:4,12,13 18:10
    28:14,15 38:16,18
    40:1 45:5,6 50:4
match 11:3 19:22
    21:10 23:12,17
    30:24 31:2 40:11

41:6
matched 10:24
    12:11,16 13:8
    23:3 24:22 25:20
    26:4,12
matches 41:14
matching 12:2
matter 10:1,23
    49:14 51:4
**McDERMOTT** 2:2,2
    3:5 4:16,18 5:6,9
    5:17,20 6:3,20,23
    7:7,10,15,21 8:1,7
    11:14 12:22 13:3
    14:15,21 15:1,7
    15:10,21 16:3
    17:11,15 22:3,12
    22:17 23:23 25:10
    25:12 26:10 27:21
    28:7,10,17 33:18
    38:7,20 39:20
    43:15,20 44:1,7
    44:13,20,22 45:2
    45:8 46:13,15
    48:10 49:9,13,17
    49:21 50:2
**McReynolds** 12:12
mean 13:12 31:22
    43:13 49:13
meaning 22:10
    46:12
means 51:20
medication 7:17
**Michael** 2:2,2 4:17
    29:7 30:5
minute 17:9
money 36:7
motor 27:10 29:21
move 5:15

**N**
**N** 3:1
name 4:17
named 4:21
narcotic 7:17
nature 37:21
need 6:9,10 15:5
    35:10
neither 41:2
never 46:7
**New** 1:23
night 9:11,22 10:18
    23:6 24:7 28:5
    32:17,23 33:1,20
    34:6
**Nike** 12:10 13:23
    30:23 31:9

DETECTIVE KEITH SCOTT

normally 27:22
Northeast 17:23
29:11 36:21 37:2
Notary 1:17 51:14
notes 34:8 51:5
number 12:19

**O**

object 14:10
objection 21:18
23:18 26:5 39:16
43:12,23 44:2
objections 4:3
obligated 22:1
observed 33:7,9,10
obtain 42:22
Obviously 5:13
occurrence 35:2,3
offender 12:11
office 23:7 29:13,16
32:9 36:20 43:1,3
45:16 49:5
officer 27:23 28:4,6
28:11 29:18 30:17
31:3 40:3 42:3,5
42:12 45:4,11
officer's 15:2
officers 23:22 39:2
46:24 48:20
OFFICES 2:2
Oh 16:4 33:14 45:1
okay 6:24 7:11 8:12
8:15,18,21 9:2,7
9:11 10:1,7,10,17
10:22 11:5,17,21
12:15 13:16,20,24
14:2,21 15:7,17
16:8,10,11,14,18
16:22 17:8,16,24
18:3,9,15,18,24
19:13,16,18,21
20:4,7,14 21:1,6,9
22:18,23 23:6,10
23:15,24 24:5,8
25:1 26:11,14,17
26:24 27:9 28:5
29:5,8,12,18,24
30:9,10,17,24
31:4,9,15 32:2
33:6,14,23 34:11
34:16 35:5,8,11
35:21 36:3,23
37:3,8,20,24
38:11 39:4,7,11
39:21,24 40:4,22
41:2,19 42:10
43:9 45:18 46:1,8

47:1,4,7,14,18,21
48:4,7
once 13:7
one-dollar 36:4
opportunity 9:17
9:21 13:17
Oral 1:12
orally 5:12

**P**

p.m 1:16 32:5 50:7
P.O 29:7
packet 16:8 43:7,7
43:10
page 3:2,9 44:24
45:1
pair 13:23
paired 28:3
paperwork 6:5
15:11 22:9 24:17
24:21 25:20 26:20
26:22 30:4 36:14
38:14 39:19 43:22
49:1
paragraph 11:24
parka 31:20,23
Parkway 1:14 2:7
PARS 26:23
part 10:19 44:15
partial 10:12,19
15:16 18:4
particular 21:4
partners 28:5
patch 34:19
pedestrian 3:17
39:2
Pennsylvania 1:1
1:15,22 2:4,8
people 24:13 34:3
47:11 48:16
perpetrator 10:13
10:24 46:4
person 10:7,19
20:8 30:1,9 37:9
37:13
Philadelphia 1:7,13
1:15,22 2:4,6,8
3:11,16
phone 33:11
Photocopy 3:14,20
photograph 3:14
3:20 14:2 15:14
15:16,18 16:1,6
16:11 18:12,13,19
photographed 12:7
35:19
picture 7:2 14:14

14:18 16:21 17:1
17:6,7,10,19 18:4
19:14 22:23 23:8
23:11,16 24:3
25:3,18 26:3,9
pictures 22:21
piece 14:12
Pike 1:23
Pisarek 2:11 4:10
5:8,19 6:2,22 7:9
7:13,20 8:5 27:24
40:3 42:4
place 8:19 9:13
35:6
placed 12:18 34:12
35:12
Plaintiff 1:5 2:5
plastic 35:12
please 5:22 6:7,12
point 36:11 47:12
49:9
pointed 37:13
police 3:11,16 7:1
28:6 31:3 32:6
33:19 34:6 37:15
38:14 42:3,22
44:14 45:4,11,22
47:5,18
Polo 34:18
positive 21:2,17,24
positively 20:21
21:14 36:15
possibly 32:16
potential 47:21
preliminary 26:23
prepared 10:23
11:19 40:1
present 2:10 35:17
35:19 46:16
previously 18:10
printed 16:17,19,21
17:3 18:14
prints 12:13
prior 7:4 21:3 24:17
privilege 44:6
probably 19:4
27:12 32:18 46:23
proceedings 51:4
process 8:14 48:23
processed 20:21
produce 43:17,21
produced 43:14
Producing 43:16
property 3:13 12:19
13:4,7 34:12,13
35:11,21
public 1:17 44:9,11

44:14 51:14
purposefully 49:4
purposes 7:3
put 11:5 12:1 13:5
30:11 31:1 40:10
42:2 46:18

**Q**

question 4:4 6:8,16
14:10 25:11 33:13
40:12
questioning 5:1
questions 5:11,12
5:13 7:4 8:3 48:11

**R**

radio 37:23 38:15
42:22 44:20 45:23
46:6,7,12,13,19
ran 47:17
read 12:4
reading 4:1
really 10:11 49:14
reasons 20:14
recall 13:20,22 19:9
46:1
receipt 3:13 12:19
13:5,7 34:12,13
35:11,21
received 24:15
25:14,22,23 45:22
receiving 24:18
recognize 17:24
28:20
recollection 27:19
record 3:15,19 6:13
6:14 11:11 12:4
14:22 15:21,23
22:6 28:22 30:12
43:6 44:16 45:4
Records 12:14
recover 33:6 34:3
49:2
recovered 9:2,15
12:9,12 32:22
34:12,21 35:14
recovery 35:17
red 19:14
refer 22:9
reference 4:19
27:10 30:1
REFERENCED 3:10
referred 11:21 31:5
49:16
regard 24:19 25:2
25:13,16,17
regarding 7:5 8:9

8:12 23:24 24:1
25:6 43:21
register 8:23 12:13
relation 34:24
rely 25:1
remark 15:5
remember 9:10
14:11
Repeat 40:12
rephrase 5:23
report 3:12,18
10:23 11:18 12:1
23:12,16 26:23
29:12,15 30:22
31:5 40:1 45:15
45:16,18
reporter 1:17 51:14
51:22
Reporters 1:21
REPORTING 1:21
reports 7:1 11:6
44:14
represent 4:18
reproduction 51:20
reserved 4:4
respond 8:2
responded 12:6
47:5
Response 48:21
result 5:12
review 9:17,21
reviewed 34:9 46:7
reviewing 46:1,5
Richard 1:4 2:11
4:18 8:9
right 8:1 10:5 11:8
14:14,16 16:13
27:22 28:22 38:5
40:14 47:8
rights 4:19
rim 19:19 20:1
robbery 8:10,19
9:12 35:6
room 17:23,23 19:5

**S**

S 3:8
saw 13:16 15:16
19:21 21:8 31:16
47:7,10
saying 10:23 16:22
17:1 18:3 19:22
20:10 21:10 23:17
25:4,6,20 26:3,12
31:15,17 33:6
says 13:12 23:12
31:9 38:10 40:7

scene 8:15,18
  46:24
scenes 12:7
Scott 1:12 3:3 4:6
  5:1 7:22 12:6,23
  38:22
Scott's 7:24
Scott-1 3:11 11:12
  11:16
Scott-2 3:13 13:1
Scott-3 3:14 17:4
  17:12,13,16,18
  18:7 19:13
Scott-4 3:15 28:14
  28:15 40:16
Scott-5 3:16 38:17
  38:18 40:1
Scott-6 3:19 45:5,6
  45:9
sealing 4:2
second 30:13 42:1
secretive 44:17
see 7:4 10:11,12
  13:17 15:14 16:11
  18:24 19:13,18
  20:1,4 23:16
  26:24 27:16,16
  29:12 34:13 45:15
  47:10
seeing 10:18,19
  37:15
send 22:18,21,23
  23:2,5 24:13,14
  29:15 45:16 48:24
  49:1,2
sending 23:6 25:19
  48:16
sent 22:4 23:4,8,10
  23:19 24:1,6,11
  24:17,21 25:3,18
  25:24 26:2,9,11
  26:14 29:13 48:22
  48:24
sergeant 2:11 4:10
  5:6,8,18,19 6:2,22
  7:9,13,20 8:4,5
  27:14,15,17,24
  42:4
sergeant's 27:16
sheet 28:24
shoe 20:2
shoelaces 19:3,4
shot 17:17
Shotland 2:6 3:5
  6:12 7:23 8:2 14:6
  14:9,19,23 15:3,8
  21:18,21 22:10

23:18 25:8 26:5
  27:18 28:9 33:12
  33:15 38:4 39:16
  43:8,11,12,18,22
  43:23 44:3,11,19
  44:21 46:11 48:15
  49:7,12,15,19,23
shoulder 34:20
show 12:24 14:6
  18:9 28:13 32:11
  38:15,16
showed 15:12 23:3
showing 17:17
  18:17
sic 34:23
signing 4:2
simple 40:13
sir 5:8
sit 13:21
sitting 42:4
situation 5:10
six 30:7 38:10
six-foot 40:20
sneakers 10:24
  11:1,4 12:1,10,11
  12:16,18 13:5,8,8
  13:18,21,23 14:3
  15:15,18 16:12
  18:4,12,22 19:22
  19:23 20:11,19,20
  21:7,9 22:24 23:3
  23:8,11,16 24:1,3
  24:19,22,22 25:3
  25:7,13,16,17,18
  25:20 26:3,4,8,9
  30:23 31:9,12,15
  32:11 41:21
sole 12:10 20:1
soles 18:21
somebody 19:6
  28:2 39:5 42:13
sorry 16:4 22:21
  33:17 38:8 45:1
speak 6:8,11 37:1
speaking 5:10 6:4,6
specifically 25:6
spell 28:8
spoke 36:16,18,19
  36:21,23 37:2
  42:17
Sport 35:12
start 5:1 7:22 40:15
state 27:5,6 29:21
stated 11:3 12:5
statement 23:14,20
  25:3 26:3,11 34:4
  36:9 37:9,24

40:10
statements 25:5
STATES 1:1
station 32:6 33:19
  34:6
stenographic 51:5
stop 6:7,9,12 39:5
  42:13
stopped 21:5 29:19
  30:17
store 9:12,19 10:3
  12:8 33:9,24 36:8
  36:19,24 47:5,12
  47:17
street 1:14,22 2:3,7
  34:22 35:14 39:6
strike 46:16
subject 44:5
submit 22:1
submitted 12:14
  22:8
Suite 1:22 2:3
SUMMIT 1:21
supervision 51:21
supplying 44:4
sure 22:15 35:3
  37:23 38:13 42:24
  47:6 49:12
surveillance 9:18
  9:22 17:5 24:22
suspect 45:23
swoosh 12:10
  18:24 20:4
sworn 4:7,11,24

T

T 3:8
tail 6:6
take 4:22 11:8,15
  15:18 16:22 19:13
  27:14 28:18 41:4
  45:3
taken 1:13 17:17,20
  17:21,22 19:6
  21:7 23:11 29:6
  35:20,22 36:1,7
  48:2 51:5
talked 47:1
tan 34:18 37:6,17
  37:18 42:9 45:23
tape 42:23 44:20
  46:7
tapes 46:2,5,6
team 48:20,21
tell 5:22 18:21
  24:18 27:9 28:22
  29:1 32:20 33:5

38:1 39:7,24
terms 43:13
testified 4:7,11
  48:16
testimony 51:3
thing 6:15 21:16
  23:15,21 24:1
  25:22 42:18
things 23:7 29:13
  41:6
think 32:16
thinking 35:2
thought 16:4 32:23
three 36:4
Thursday 1:15
tiled 18:2
time 4:4 8:16 9:8
  10:11,14 25:2,21
  36:11,14 37:1,8
  41:3 46:1 47:5
today 7:18 9:17
  13:16 19:22 47:7
told 11:16 36:7
  42:17
top 16:20
Torresdale 26:21
  29:20 34:24 35:4
total 36:1
transcript 51:7
translate 34:2
trial 4:4
true 51:6
try 33:12
turn 8:4
turned 9:1 14:13
twice 5:2
two 4:20 12:12
  40:15 47:11
type 7:16 39:22

U

U.S 34:18
Uh-huh 24:20 40:17
  48:18
understand 5:15,18
  5:22,22,24,24
  6:18,21 7:5,8,11
  18:18 25:15 44:2
understanding
  7:18
unit 22:7 24:2 25:24
UNITED 1:1
use 6:10 15:6

V

vehicle 3:17 27:6
  27:11 29:22 39:6

38:1 39:7,24
video 8:20 9:15,18
  9:18,22 10:2,5,8
  10:10,17,22 12:8
  12:12 13:9,17,21
  13:24 17:4,17,20
  19:21,23 20:2,5
  21:8,10 22:18
  23:3,4,5,13,17
  24:5,12,13,15,18
  24:23 25:23 26:4
  31:16 32:15,22,23
  33:1,3,7,7,10,21
  33:24 34:2,3,9
  47:7,10,11 48:20
  48:20,21,21 49:1
  49:2,4
Videographers
  1:21
videos 24:14 48:17
violation 4:19
voice 6:6
vs 1:6

W

wait 30:5,10,10
  32:16 33:12
waived 4:3
walking 27:6
wall 17:24 18:2
Walnut 1:22
want 6:10,11 14:6,9
  14:23 43:5 45:3
  49:21,23 50:1
wasn't 10:5 21:2
  27:17 32:17 35:19
  39:14
water 6:11
way 5:1,23 40:13
  44:17
we'll 5:15 6:12,14
  7:2,3,22 11:9
  28:13 38:16 40:13
  40:13 45:5
we're 6:24 17:2,8
weapon 37:13
wearing 10:24 11:1
  11:4 18:5 30:18
  30:22 31:7,12
  39:14,19 41:3,7
  45:23
went 9:12 16:20
  33:19
weren't 35:17
whereabouts 35:8
white 12:10 13:23
  19:1,10,11 20:1,4
  30:6 37:6,16,18

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

40:5,20 42:9
45:23
**Winter** 2:3
**withdraw** 23:24
**withdrawn** 9:8
**withhold** 49:4
**WITNESS** 3:2 7:14
15:24 21:20,22
22:13 23:22 26:7
27:20 33:14,17
38:6 39:18 46:14
**witnesses** 47:21
**working** 28:2
**worn** 12:11
**wouldn't** 21:22
**writing** 19:17,18
**written** 42:3
**www.summitrep...**
1:24

**X**

**X** 3:1,8

**Y**

**Yeah** 8:5 15:1 16:15
30:10 49:2,19

**Z**

**0**

**08037** 1:23

**1**

**1** 11:9 45:1
**1:17** 1:16
**10-dollar** 36:4
**10:00** 32:5
**1026** 2:3
**105** 35:12
**11** 3:11
**13** 1:15 3:13
**14th** 1:14 2:8
**15** 3:20
**1500** 1:22
**1515** 1:14 2:7
**16-5671** 1:8
**1610** 1:22
**17** 3:14
**19102** 1:22 2:8
**19107** 2:4

**2**

**2** 12:23 44:24
**2:08** 50:6
**2:31** 22:15
**20-dollar** 36:3
**200** 2:3 36:10

**2013** 32:4
**2017** 1:16
**215** 1:23 2:4,9
**229** 31:6 41:4,5,5
42:3
**23rd** 32:4
**28** 3:15

**3**

**3/24/2013** 22:16
**3088458** 35:21
**3088459** 12:19
**3090993** 34:13
**3090994** 35:11
**38** 3:16

**4**

**4** 3:5
**424** 1:23
**45** 3:19
**4500** 35:5,9
**4565** 34:22 35:14
**4665** 34:23
**477-8648** 1:23
**48** 3:5
**49** 11:20

**5**

**501** 29:4,9
**55** 38:22
**567-3315** 1:23
**5th** 18:11

**6**

**609** 1:23
**656** 45:14
**683-5000** 2:9

**7**

**75-229** 30:21
**75-48** 38:23,24
**75-483** 28:24
**75-48A** 39:1
**75-49** 11:22
**7500** 26:20 29:20
34:24 35:4

**8**

**800** 1:23

**9**

**925-9732** 2:4
**93** 12:9 36:2
**985-2400** 1:23

## Philadelphia Police Department Investigation Report

DC Number   2013-15-026895
Report No   2013-15-026895.1
Report Date   3/30/2013 9:18:24 AM
Report Type   Investigation Report (75-49)

# A - Approved
Page 1 of 4

### Unit Control#: 2013-6400-004373-0

| | | | |
|---|---|---|---|
| Classification | 0390 - ROBBERY MISCELLANEOUS HANDGUN | Occurred On | 3/23/2013 12:00:01 AM |
| Previous Classification | 0390 - ROBBERY MISCELLANEOUS HANDGUN | Reported On | 3/23/2013 7:49:39 PM |
| Location of Occurrence | 4542 Cottman Ave #2 | Disposition / Status | 2 - Arrest |
| Dist/Sect of Occurrence | 15th District PSA 3 | Clearing Unit | 1500 - 15th District |
| Responding Officer | P/O BRIAN CLERKIN (PR 248602 / #4625) | Investigating Officer | Det KEITH SCOTT(PR 235734/ #7603) |
| Assisted By | P/O JOSEPH SEES (PR 233895 / #2801); | Dist/Unit Preparing | 6400 - Northeast Detective Division |
| Related Cases | | | |

## Report Approval

| | | |
|---|---|---|
| Completed | 3/30/2013 9:18:24 AM | Det KEITH SCOTT (PR 235734 / #7603) |
| Approved | 4/1/2013 11:59:42 AM | Sgt MICHAEL DOUGHERTY (PR 193541 / #0273) |

## Report Summary

ON 3-23-13 15TH DISTRICT OFFICERS ARRESTED ONE MALE FOR ROBBERY.

COMPLAINANT:XIU MEI XIAO
On Saturday March 23, 2013, at approx. 7:43pm,Xiu Mei Xaio, owner of Red Sun Food Market, located at 4542 Cottman Ave, states she was working behind the counter when the offender came in the store, approached the counter, threw a quarter on the counter and grabbed some Mike N Ikes candy. The offender then pulled out a black hand gun, pointed it at the complainant, and demanded she open the cash register. The compl. states while she attempted to open the cash register the offender became angry and attempted to open it himself. The offender then pointed the handgun at the compl. and pulled the trigger several times as if he was attempting to shoot her and held the weapon as if he wanted to hit her with it. The complainant states at that point she noticed the gun wasn't real. The complainant began to fight the offender off as he yanked at the cash register. The offender then pulled the cash register free and fled the store. Minutes later, as a result of flash info relayed over police radio, P/O Berkery #9464 stopped the offender on the 7500 Block of Torresdale ave, where he was positively identified by the complainant. The offender was placed in custody and transported to 15th District CCTV.
   P/O Apostolou#7142 and P/O Burgoon#9314 located the offenders tan coat containing the plastic handgun on the sidewalk at 4565 Aldine St. (Aldine & itman)
   P/O Manes#2211 and P/O Nodiff #1925 located the cash register on the sidewalk at 4556 Teesdale St. (Teesdale & Ditman)
   The Assigned, Det. Scott #7603, responded, photographed the scenes, and made a copy of the incident which was caught on store surveillance video. At headquarters the assigned recovered $93.00 and dark blue Nike sneakers with white swoosh and sole from the offender. The offender's sneakers matched those worn in store video. Det. Mcreynolds#8107 recovered 2 latent prints from the bottom of the cash register and submitted them to Records and Identification.
P/O DESCHER#6699 RETURNED TO THE STORE ON 3-25-13 AND RECOVERED THE VIDEO.
INITIAL REPORT:P/O BRIAN CLERKIN (PR 248602 / #4625)
ASSIGNED: DET. SCOTT #7603

## Classification Detail: 0390 - ROBBERY MISCELLANEOUS HANDGUN

| | | | | | | |
|---|---|---|---|---|---|---|
| Location | 199 - Locations Other than Listed | | | | No. Prem. Entered | |
| Offense Completed? | YES | | Using | | Entry Method | |
| Hate/Bias | None (No Bias) | | Criminal Activity | | Type Security | |
| Domestic Violence | NO | | Weapons/Force | Handgun | Tools | |

## Victim / Complainant V1: XIAO, XIUMEI



| | | | |
|---|---|---|---|
| Address | | DOB | Officer Payroll # |
| CSZ | | Age / Race / Sex | District / Unit |
| Home Phone | | Ethnicity | SSN |
| Cell Phone | | Occupation/Grade | OLN |
| Beeper | | Employer/School | OLN State / Country / |
| Email | | Emp/Sch Address | Injury |
| Work Phone | | Emp/Sch CSZ | Circumstances |
| Found Date | | Found Location | Reason for Absence |
| Reason for Cancellation | | Found City | |
| PCIC/NCIC | | | |
| Notification | | | |
| Victim Notes | | | |



## Interview Section

| | | | | |
|---|---|---|---|---|
| Interview Date | 3/23/2013 10:00:00 PM | Interviewed By | Det KEITH SCOTT (PR 235734 / #7603) | 75-483 Completed   YES |
| Interview Location | Nedd | Others Present | | |

Interview Summary   I was working behind the counter when a white male came in the store wearing a tan coat with the hood up. He came to the counter and

| PROPERTY RECEIPT | FROM WHOM TAKEN | | AGE | SEX | № 3088459 |

**PROPERTY RECEIPT**

FROM WHOM TAKEN: Richard Collins    DOB 4-22-80

AGE: 32    SEX: W/M    № 3088459

☐ LOST AND FOUND

ADDRESS: 9101 Blue Grass Rd

DATE: 3-23-13    TIME: 11:06    DISTRICT: NEDD    UNIT: NEDD

☐ FOR INVESTIGATION

OWNER (If Known): same

LAB USER FEE REQUESTED ☐ YES ☐ NO    DC NO.: 13-15-26895

☐ PERSONAL PROPERTY FOR SAFEKEEPING

ADDRESS: same

SEIZURE NO.

☒ EVIDENCE

DEFENDANT'S NAME: Richard Collins

BULK OF PROPERTY STORED AT: City Hall Evidence

ITEMS OF PROPERTY AND CIRCUMSTANCES UNDER WHICH IT WAS RECEIVED INCLUDING THE EXACT LOCATION TAKEN FROM

1. EVIDENCE – Dark Blue Nike Sneakers with a White "Swoosh"(nike symbol) and white soles

2. CIRCUMSTANCES– Above sneakers were confiscated from the above defendant.after he was arrested for robbery.Sneakers worn by the defendant match those worn by the offender in the stores surveilance video

3. CHARGES –  Robbery and related offenses

4. ASSIGNED –  Det. Scott #7603      NEDD#13-4373

5. UCR-  390

EXHIBIT
2011-2
4-13-17AB
PENGAD 800-631-6989

If the person from whom the above amount of money and/or property was taken does not sign below, state reason why:

**RECEIVED  BY  POLICE  DEPARTMENT**

Arresting  or Receiving Officer:  (If personal property for safekeeping, Desk Supervisor is the Receiving Officer)

PERSON FROM WHOM TAKEN (Signature)

| WITNESS (Signature) | BADGE NO. (Type) | SIGNATURE | BADGE NO. (Type) |
|---|---|---|---|
| Det. Sullivan | #652 | Det. Scott | #7603 |

**TRANSFERRED  TO  EVIDENCE  CUSTODIAN/COLLECTOR**

I hereby  acknowledge  receipt of the above  listed  items.

| (Date) | (Time) | (Evidence Custodian/Collection) |

**RELEASE  FROM  CUSTODY  OF  POLICE  DEPARTMENT**

This will acknowledge  the receipt from the Police Department of the City of Philadelphia of the amount of money and/or property listed above, and will constitute the release of the City of Philadelphia and its agencies from any and all future responsibility therefor.

☐ Returned to Owner or Agent
☐ Confiscated by Court
☐ Destroyed by Order of Court
   Petition No. _____
☐ Escheat to State
   Escheat List No. _____
☐ To Department of Collections
☐ Other Disposition (Explain):

**RECEIVED BY** (Owner or Agent)

OWNER OR AGENT (Signature)

| WITNESS (Signature) | BADGE NO. | DATE |

**RECEIVED BY**  (Other than Owner of Agent)

SIGNATURE AND TITLE

| WITNESS | DATE |

75-3 (Rev. 6/95)

**POLICE DEPARTMENT**



| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT Northeast Detective Division | CASE #13-04373 INTERVIEWER: **Det. Dewey #501** |

| NAME P/O MICHAEL BERKERY | AGE | RACE | SEX | DOB |
|---|---|---|---|---|
| ADDRESS | APARTMENT # | | | PHONE |
| NAME OF EMPLOYMENT/SCHOOL | | | | SSN# |
| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | | | PHONE # |

| DATES OF PLANNED BUSINESS TRIPS | | |
|---|---|---|
| NAME OF CLOSE RELATIVE | | |
| ADDRESS | | PHONE# |
| PLACE OF INTERVIEW N.E.D.D. | Date 03/23/13 | TIME 9:50PM |
| BROUGHT IN BY SELF | DATE 03/23/13 | TIME 9:50PM |
| WARNINGS GIVEN BY | DATE | TIME |

| ANSWERS | | | | | | |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

Q. Officer what happened at 4542 Cottman ave this evening that brings you to N.E.D.D.

a. I responded to a robbery in progress at 4542 Cottman ave at approximately 7:45pm, today's date. Prior to my arrival I heard flash information being transmitted over police radio I surveyed the area. I saw a w/m that fit the description at 7500 torresdale ave I stopped that male. The complainant was brought to my location where the suspect was positively identified as the offender for the robbery at 4542 Cottman ave at the Red Sun food market.

Q. Were you solo or working with a partner?
A. A partner Sgt Pisarek # 348 15th dist 5-E

Q. what was the suspect wearing when you stopped him?
A. A grey hoodie and blue jeans.

Q. what was the flash information on the suspect?
A. W/M 6' green eyes black jacket with fur on the hood and blue jeans.

Q. Why did you stop this male?
A. He fit the physical description of the offender.

Q. Did you recover a gun?
A. No

Q. Before I conclude this interview is there anything else you can tell me?
A. No

EXHIBIT
PENGAD 800-631-6989
SCOTT-4
4-13-7AB

P/O R  9464

| RECORD [ ] YES   [ ] NO | CHECKED BY: |
|---|---|
| REVIEWED BY: | |

75-483

FORM 75-48A

POLICE

**PHILADELPHIA POLICE DEPARTMENT**
**VEHICLE OR PEDESTRIAN INVESTIGATION REPORT**

DRAFT F 4/13/99

PAGE ___
OF ___

**GENERAL**

| YEAR | DIST OCC | D.C. # | SECT | DIST | VEH # | REPORT DATE | | TYPE OF STOP | ☐ CURFEW ☐ VEHICLE ☐ TRUANT ☒ PEDESTRIAN | ☒ VEHICLE | CODE |
|------|----------|--------|------|------|-------|-------------|---|------|------|------|------|
| 13 | 15 | N607163 | 3 | 15 | T1 | 3/23/13 | | | | | 2701 |

LOCATION OF OCCURENCE: 7500 TORRESDALE AV.   APT # ___   TYPE: ☐ INSIDE ☒ OUTSIDE   53   TIME OUT: 7:55 ☐AM ☒PM

DATE / TIME OF OCCURENCE: 3/23/13  7:55 ☐AM ☒PM   DAY: 6   DATE / TIME OF RELEASE OR ARREST: 3/23/13  8:10 ☐AM ☒PM   TIME IN: 8:10 ☐AM ☒PM

NAME OF PEDESTRIAN/DRIVER: Richard Collins   SEX: ☒M ☐F   AGE: 32   DOB: 4/22/80   RACE: ☒1 WHITE ☐3 ASIAN/PACIFIC ISLANDER ☐2 BLACK ☐4 AM. INDIAN/ALASKAN NAT   LATINO: ☐Y ☒N

ADDRESS: 9101 Blue Grass Rd.   APT # ___   CITY: PHILA   STATE: PA   ZIP CODE: 19114   DIST RES: 8   NICKNAME: ___

SS# ___   OPERATOR'S LICENSE #: 26431 780   STATE: PA   HEIGHT: 6'0"   WEIGHT: 175   BUILD: AVG   EYE COLOR: GRN   HAIR COLOR: BRO

FACIAL HAIR: BEARD   COMPLEXION: LIGHT   ACCENT: No   FURTHER DESCRIPTION (SCARS, CLOTHING, ETC): GREY HOODIE / JEANS

**MUST BE COMPLETED**

**PED STOP**

☒ INDIVIDUAL MATCHES FLASH INFO   FLASH INFORMATION: GREY HOODIE / BLK JCKT w/ FUR on Hood/ BLUE JEANS

☐ INDIV. INVOLVED IN DISTURBANCE   TYPE OF DISTURBANCE ___

☐ OTHER REASON FOR STOP   DESCRIBE FULLY INCL SUSPECTED CRIME: ABOVE MALE stopped for matching FLASH INFO FROM ROBBERY. POSITIVE ID'd By comp. TAKEN TO 15TH for Processing.

ARREST ☒Y ☐N

☒ VICTIM ☐ WITNS   NAME: XIUMEI XIAO   SEX: ☐M ☐   AGE ___   DOB ___   POSITIVE ID: Y☒ N☐

ADDRESS ___   APT # ___   CITY ___   STATE ___ ZIP CODE ___   PHONE (HOME) ___   PHONE (WORK) ( )

**VEHICLE STOP**

☐ VEHICLE MATCHES FLASH INFO   FLASH INFORMATION ___

☐ VEHICLE IN VIOLATION OF MVC   CODE SECTION ___   REASON FOR STOP ___   TC ISSUED ? ☐Y ☐N

☐ VEHICLE INVOLVED IN CRIMINAL ACTIVITY   DESCRIBE FULLY INCL SUSPECTED CRIME ___

EXHIBIT
PENGAD 800-631-6989

☐ OTHER   DESCRIBE FULLY ___   ARREST ☐Y ☐N

| YEAR | MAKE | MODEL | TYPE | COLOR | STATE | M/YR EXPR | PLATE # |
|------|------|-------|------|-------|-------|-----------|---------|
| | | | | | | | |

VIN ___   DISTINGUISHING CHAR ___

REGISTERED OWNERS NAME (LAST, FIRST) ___   ADDRESS (NUMBER, STREET) ___   CITY ___   STATE ___ ZIP CODE ___

**SEARCH/SEIZURE**

INDIVIDUAL/VEHICLE FRISKED ? ☒Y ☐N   (IF YES STATE REASON(S) WHY YOUR SAFETY WAS AT RISK?): MALE WAS stopped for matching info for ROBBERY point of Gun, male had Bulge in front Pocket Witch was Cell phone

INDIVIDUAL/VEHICLE SEARCHED ? ☒Y ☐N   (IF YES INCIDENT TO ARREST, RESULT OF FRISK, OTHER PROBABLE CAUSE?): And Wallet. INCIDENT TO ARrest

EVIDENCE/CONTRABAND RECOVERED ? ☐Y ☒N   (TYPE AND LOCATION RECOVERED) ___

**MISC.**

REPORT PREPARED BY: Berkery   PAYROLL: 933734   BADGE: 9464   DIST/UNIT: 15   PISARFK # 348

REVIEWED BY ___   PAYROLL ___   DIST/UNIT ___   REFERRAL DATE / /   GEN # ___

| INVESTIGATION INTERVIEW RECORD | | PHILADELPHIA POLICE DEPARTMENT NORTHEAST DETECTIVE DIVISION | CASE# 13-4373 INTERVIEWER: DET LENA ALLEN #656 |
|---|---|---|---|

| NAME P/O Apostolou~~████████████~~ | AGE | RACE/SEX | DOB |
|---|---|---|---|
| ADDRESS ~~████████████~~ | APT# | | PHONE# ~~████████████~~ |
| NAME OF EMPLOYER / SCHOOL | | | SS# |
| ADDRESS OF EMPLOYER / SCHOOL | | | PHONE# |
| DATES OF PLANNED VACATION / BUSINESS TRIPS | | | |
| NAME OF CLOSE RELATIVE | | | RELATIONSHIP |
| ADDRESS OF RELATIVE | | | PHONE# |
| PLACE OF INTERVIEW NEDD | | | DATE 3/23/13   TIME 10:55PM |
| BROUGHT IN BY | | | DATE   TIME |
| WE ARE QUESTIONING YOU CONCERNING: ROBBERY | | | |
| WARNINGS GIVEN BY: | | | DATE   TIME |

| ANSWERS: | | | | | | |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

Q).Can you tell me what brings you to Northeast Detectives?

A) While working 15BD2 me and my partner P/O Burgoon#9314 we responded to a Robbery point of gun at 4542 Cottman Ave, while enroute we received flash information over Police Radio of the suspect a w/m, tan /coat w fur around the hood armed with a black gun. While surveying the area we heard a 15th District Unit come over Police Radio with a apprehension of the suspect and positive Id Marple & Torresdale Ave. The suspect did not have the gun or a jacket on him, at that point we back trace wear the original job took place and where the male was stopped. While surveying the area for the gun and the jacket. We observed the a tancoat w/fur on the hood and a black gun inside the coat pocket on the sidewalk at 4565 Aldine St.I notified Police Radio that we had a tan coat w/ a gun in the pocket . The complainant was transported to our location and positively Id the gun and the jacket. The jacket was placed on Property Receipt#3090993 and the gun was placed on Property Receipt #3090994 .

Q).Anything else you want to tell me?

A) No

P/O Apostolou #7142    3-23-13



| RECORD ☐ YES  ☐ NO | CHECKED BY: |
|---|---|
| REVIEWED BY: | |

76-483



EXHIBIT

PENGAD 800-631-6989

COLLINS-1
4-13-17AB